May it please the court, I'm Richard Kwan, attorney for Nina S. Manning, a felon in this case. Ms. Manning is before this court pursuant to her conditional plea of guilty, in which she reserved her right to challenge and to appeal the denial of her motion to suppress evidence and statements. She respectfully submits that any and all statements that she made to Naval Investigative Service agents on June 20, 2005 were inadmissible as evidence because, number one, they were unwarranted statements obtained during custodial interrogation, and number two, because they were involuntary and coerced. The felon also submits that any evidence thereafter obtained as a result of the illegal statements were the tainted fruit of the poisonous tree and must be suppressed. Now, at the outset, this court has unequivocally held that the denial of a motion to suppress is reviewed non-deferentially. In other words, the issue of whether a defendant is in custody for the purposes of Miranda is a mixed question of law and fact warranting de novo review. Well, the de novo review is really the application of the law, isn't it, Counselor? Well, Your Honor. We're really talking about factual findings here, which the district court has the full authority to put together. We only review those on clear error, and then, if they've misapplied the law, that's, of course, de novo. Well, Your Honor, that would be the case if the test wasn't a mixed question of fact and law. That's what makes it mixed. Well, let's correct Your Honor. We give the district court the ability to make the facts, and we don't do that only on clear error, but we're going to put a de novo analysis of whether the law affects the facts differently than the district court suggested, isn't it? Well, Your Honor, I would submit that that is partially true. We would submit, in any event, that the facts that were found by the court, the trial court below. Historical facts really aren't seriously in dispute. It's just your argument is these facts, when you look at these facts, they add up to custody. That's correct, Your Honor. Right? Absolutely. You look at our case law, and you look at what we've considered important in determining whether somebody's in custody. That's correct, Your Honor. Absolutely right. So why don't you, in your view, and we've read your briefs, I've read your briefs and everything, but this is your chance to point to those circumstances that lead inescapably to a legal conclusion that she was in custody at the time she made her statement. Well, Your Honor, when you look at all of the factors that this court and the Supreme Court has set forth as indicating custody, it is clear that if you take all of them together, because the totality of the circumstances test is what is at issue, then we would submit that even if Well, you start, you know, so you start out with, you know, her invitation, the summonings her That's correct, Your Honor.  That's correct, Your Honor. It's hard to conclude much there. She volunteered, and they went to her house. They said, we'd like to talk to you. We've got some new information. We'd like to talk to you separately. They said, okay. You know, let's go to the office. You can drive if you want. Well, Your Honor So they arrive at the office. They go to a fairly large room that is, they close. They ask if they can close the door. Well, Your Honor So summoning her there, which is one of the factors we look at, it looks pretty much like she kind of went along. Well, Your Honor, I would submit that that has to be looked at in context. Prior to going there, it's clear that what the agents were doing was setting up a strategy to set circumstances where she would be basically taken and separated from her family. I think that's one of the key things about how she was summoned. It's clear that what they did was, first of all, they separated her from her family. They drove her over three miles away. There was no way that she could get back from this naval base where you had to get in, a naval submarine base where you had to get in through a security checkpoint. Once you were on the base, then you had to go to, she was taken to the NCIS office, essentially the station house, where it was again secured. You had to have a combination to get in with a cipher lock. It was late in the afternoon, early evening. Nobody else was there. No civilians, as far as we know, basically law enforcement personnel. So here we have where she was summoned into a police-dominated… The base wasn't foreign to her, was it? The base wasn't foreign to her, was it? Well, Your Honor, that is unclear because she was a dependent. She may have been there on occasion, but basically it was a secure base. It was submarines. Well, not only that, but while you were great to emphasize the kind of things that it took to get her in, the evidence on the record is she could have got out without any problem. She didn't have to have any clearance to get out. She didn't have to have any permission. She could have just gone right through those points without problem going out. Well, Your Honor, that would be nice if we were living in a perfect world, but what we had here was a lone woman, separate young woman in her 20s, taken to a base three miles away. It was getting dark. She had no means of transportation except the agents, and they certainly didn't… But that was at her discretion, wasn't it? No, Your Honor. We would submit the facts indicate that she really didn't have any discretion. At what point was she in custody? Well, Your Honor, we would submit that she was in custody right from the outset. One of the things that I thought was interesting, Your Honor, was the fact that this was supposed to be an interview, and yet one of the agents was armed in violation of NCIS policy. When agents are armed, they expect some problems. They expect to take people into custody, and yet they tried to gloss over this. So it was clear that the circumstances, both subjectively and objectively, indicated that she was going to be taken in this car, unmarked car, by these two agents. And what's even more troubling is the fact that supposedly this was supposed to be for her convenience. As soon as she left, the agents called other agents to take care of her husband, to sort of keep him away from her. So it was clear that she was isolated right from the beginning. You know, the police can start off with an interview and, you know, have a friendly conversation, which can eventually, given the circumstances, result in a custodial interrogation. That's correct, Your Honor. So what happened, so as I understand from the briefing and the record and whatnot, is they get her in there, and then they confront her with this evidence. That's right, Your Honor. Right. Absolutely. Now, that seems to me to be a little bit stronger that suggests that she might, after they confront her with all this information, that the report in the Honolulu Police Department was not, the coroner's report was not accurate. Well, Your Honor, that's absolutely right. And not only did they confront her, but they misled her. Now, up to this point, because of the previous medical examiner's report, she was told that the child had stopped breathing because of pneumonia, pneumococcal pneumonia. And so she was, when agents came in, they misled her by saying, well, you know, we have a report from the Armed Forces Institute of Pathology, and they said that asphyxia was a cause, when actually, as the facts are clear, they simply said that there are circumstances that suggest asphyxia, but the actual cause was undetermined. The cause of death was undetermined. So they misled her, in addition to confronting her with all of the things that they felt were red flags, as they put it, from her previous statement. Did they use the term red flags? Yes, they did, Your Honor. As a matter of fact, as part of the interrogation, Agent Picard pointed out, well, we wanted to clear up all of these red flags. Now, let me ask you, one thing I couldn't understand, and that's because this interview wasn't recorded, correct? Your Honor. The first part of it wasn't recorded. Yes. She did give a statement, right? Her statement. That was later. Her statement later about, I believe it was 945 or something. Did they go through a series of questions with her, or did they just say, ah, this is what we've got, what do you have to say? Well, Your Honor. What did they do? Well, they went through a series of questions. They went through the red flags. When she came up with answers, they said, well, you know, it doesn't sound like you're telling the truth. In other words, your statement lacks veracity or whatever. So in other words, she was lying? Essentially, that's what they were doing on one occasion. In the report of the agent itself and in his testimony, he points out at least on two, possibly three occasions, that they told her that she wasn't being truthful. And this is only what they reported. Counsel, what troubles me is that if we accept your argument, that anyone who, that this, by accompanying the police, the officers, to the, essentially, station house, after being asked if she was willing to go, and that everyone who winds up being questioned in the station house is in custody. And we know that that's not true. You can, there are lots and lots of situations, lots and lots of cases where people voluntarily agree to talk and find themselves in trouble and can get convicted of very serious crimes. And so there has to be something really significant here. It seems to me in reading the cases in the Supreme Court cases that say that this went over the line and at some point she was in custody. And I'm not understanding from your argument when that would be. Because I don't, I personally don't accept the position that she was in custody from the get-go. Well, Your Honor, I can certainly understand that. But it's clear that if you look at the Supreme Court and this Court's cases, what they're contemplating is a brief period of questioning, which goes to Judge Pius's questions concerning how long was she interrogated, how many times was she interrogated, how was the interrogation done. All of the cases, including the Supreme Court cases, contemplate a situation where I'm a good citizen, the police ask me to come with them so that I can answer a few questions, they satisfy themselves, and then off you go. I think each of the cases that we cited pointed that out. I understood his questions, but I'm not quite sure I understand your answers. Okay, well, I'm sorry, Your Honor. Essentially what I'm saying is that when it exceeded the period of brief questioning that is contemplated by both the Supreme Court and Ninth Circuit case law, that clearly became custodial. How far along had she been in there with them? Was it before she began to acknowledge? Your Honor, there's some dispute about it. For example, in the psychological evaluation, it pointed out that they went over her story at least two times before they turned on the video camera. The agent said that, well, we had to sort of explain why we were there and point out all the red flags and point out misrepresent. We would submit the results of the AIP investigation. Did the district court judge make a finding of what point it was that she began to confess? Your Honor, I believe the district court judge outlined, as Judge Smith was pointing out, made factual findings about when different things occurred. So to that extent, yes, there was some type of a timeline that occurred with respect to what happened. She was taken to the office at about 5.50. She was talked to about what was going on. And then at some point, possibly after 9 o'clock, which is over a couple of hours, she was finally videotaped after they had gone through her statement. Well, if you look at the timeline, and I guess this is my problem, there are five factors to talk about here. That's correct, Your Honor. And I looked at what the district court did. The first is the language used to sum it. The district court said the language was okay, and frankly, me giving review to it seems okay. The next was the extent to which she was confronted with the evidence. The district court said the manner in which she was told about the evidence makes factor two not custodial. So we had to look at what was exactly said there. How did they present it? Was it you're guilty because we have this to say, and so what is your explanation, or is it something else the district court looked at? So we look at that. So then we go to physical surroundings. And while I hear your argument, it didn't seem to me that was a very big one because I've gotten to U.S. v. Norris, which says you're not in custody at the police station when you voluntarily agreed to go and you're free to leave at any time. Duration of detention. I think my colleague's question is interesting because they go get this lady, and at 5.50 they're at the place, and by 7.25 she's not only said what her problem is, she's told everything about what she has to tell there. So we're not talking about a great long time. By the time she starts talking, we haven't even been there two hours. And then I got U.S. v. Lee, which is our case, which says questioning over an hour is not custodial. So then I'm not sure about the duration. The degree of pressure applied, there was no pressure applied. She broke when she wanted to. She went to the bathroom when she wanted to. She quit when she wanted to. I mean, I'm, of course, being a devil's advocate, but I'm trying to put these factors in front of you as to what you're going to do to undo them given the factors I have to apply. Well, Your Honor, we would respectfully disagree with your analysis of the facts. I think the facts have to be looked upon de novo, and I think we've tried to distinguish both the Lee and Norris cases in our brief, which point out that these short periods of time are not the facts of this particular case. In other words, as far as the physical surroundings, I think the Supreme Court and this Court place a great deal of emphasis upon the fact that the person is separated and isolated. So we would submit that, for example, with respect to her isolation, that that clearly indicates that there was some – Okay. I think we understand your position on that. We have issued time. Thank you very much, Your Honor. Thank you. Good morning, Your Honors. May it please the Court and all of the Counsel. My name is Loretta Sheehan, and I represent the United States of America. Your Honor, this case is a textbook example of how to conduct a voluntary and noncustodial interview. Whose textbook? Hopefully the Ninth Circuit's, Your Honor. And I believe the Ninth Circuit's. Your textbook, Your Honor. News to me. The one we'll be writing today. I guess it depends on which panel wrote the textbook. As Your Honor, Justice Smith has pointed out, in terms of a Miranda analysis, there are five factors that traditionally have been – and they're non-exhaustive, but they traditionally have been examined, and that is the language used first to summon the person. That's significant in this case because this was a very low-key, soft, trusting kind of interview. They approach the house. They're wearing plain clothes. No weapons are displayed. I was a little disturbed in argument when Mr. Kiwanis said that there was mention of a weapon in violation of NCIS regulations. I don't believe that's anywhere in the record. And correct me if I'm wrong, please, but I don't believe that that's there. He had one that just wasn't displayed. It was on the table. And that's not in violation. Right. The agents asked if they could talk to Mr. and Mrs. Manning. They both agreed. They made sure that child care was available. Mr. Manning, they didn't call an additional police to make sure that Mr. Manning would stay away from his wife. He was questioned as well. They also made it known that they wanted to talk to him separately. And they explained why, Your Honor. They said, hey, we don't want you guys tainting each other's statements. Would that be okay? And they said, sure, that's totally fine. And they asked her if she wanted to come down, if she was willing to come down to the station. They asked her if she wanted to drive her own car. And she said, well, we have a car, but you know what? If David needs it for the kids, then I want to leave you. So I'll go with you, if that's okay. She voluntarily gets into their car. She picks the front seat. She puts her own seat belt on. I mean, there's absolutely nothing coercive about this at all. Well, this takes place three years after the child was killed. Actually, it's approximately two and a half. The child was killed September 2002. And they're not interviewing her until late June of 2005. What did they say to her when they? That's a little unusual. It's very unusual. And that was because of the misdiagnosis at the autopsy. And what is it that they said to her? They said, we want to talk to you about some things that happened back in Hawaii. So at the doorstep, they're not leaping down her throat. They're saying, you know, can we talk to you? There's some problems, you know. And so it's when they get into the NCIS office, they pull out quite accurately the Armed Forces and Institute of Pathology report, which says that the circumstances surrounding the death and the forensic findings are strongly suggestive. It wasn't suggestive, but strongly suggestive of asphyxia. And the agents did shorten that. They said, they indicated that this child died of asphyxia. And her reaction is, oh, what a relief. Because, you know, first they said pneumonia, and she didn't look sick to me. And the findings of the court, which are, in fact, reviewed for the factual findings, which are, in fact, of course, reviewed for CLAIR, was that this was a non-confrontational, polite, low-key approach the entire time. There was, in terms of. But they essentially told her as they went through the, after they revealed to her what the. Right. The new autopsy. And they asked her, got her responses to some questions that they had. They essentially told her she was lying. Yes, Your Honor. And I think that Judge Smith raised a really important point. It's the way you say that someone's lying. What difference does it make? It makes a huge difference, Your Honor. In the Tolliver case, if I'm allowed, am I allowed to swear? In the Tolliver case. I don't know. In the Tolliver case, when detectives were interviewing a gentleman who was in the police station, they're saying, so, dude, I need you to be straight with me and don't XX me. And then they curse on and on. They're swearing, and it's a confrontative thing. And they're like, don't give me that. And they're throwing their hands up. This was, these are southern gentlemen. They're sitting there. The court had the ability to review the manner in which they spoke during the videotape. And while they're on the stand, they were saying, now, Nina, we have kids. We have children. And, you know, you're telling me Cecilia's 13 months old and that she toddled over and put a, you know, a 10-pound aspen on her head? Why isn't it just guilt-tripping? That's okay. That's not, pardon me, I blanked out. That is not coercive. That's what I'm looking for. That is not coercive. But they're confronting you, though, with the evidence against her. And that's totally all right, Your Honor. You're not allowed to bow, browbeat. So the problem, though, is at some point, I mean, so the test, really, the ultimate test for custodial interrogation is whether or not the individual would feel free to leave. And so after you're essentially been confronted with all this information, you're in this office, you're in there with two NCI officers. Right. I mean, is a reasonable person going to really feel free to get up there? I'm walking out of here. I don't want to talk to you guys anymore. Correct. And because in this case, in this case, Ms. Manning was specifically told, and there was a finding by the district court, that she was specifically told before they began, now you are free to go. You do not have to talk to us. You can terminate this interview at any time, and you know what? We're not, we're going to take you home. After they confronted her with all this information. No, no, no, no, no. No, I'm saying, no, no, no. I'm saying after they confronted her with the information, they say, okay, now before you answer these questions, you're free to leave. They did not repeat the warnings. They did not repeat the warnings. That's absolutely true, Your Honor. But there was, our position is there was absolutely no need to repeat the warnings. This woman acknowledged that she understood. She's free to go. She can go. She can end the interview. And, in fact, that understanding was implicitly repeated throughout the evening, where she's going out, she's going outside, she's having a smoke break, she's going to the bathroom. Did she ever get anything to eat? Well, it was, we didn't discuss food. I mean, she was there from, they left, they arrived at the house a little before 6, and the taping takes place at 10, and she gets two bathroom breaks and a couple cigarette breaks. Well, it's. She's there. She doesn't know that she's, that there's been a, that they think there's been a crime committed. I think she knows that pretty quickly. Well, she said until she got there. An important point. I don't know how hungry you are while you're confessing to murder, so I don't really know that that's, I mean, that wasn't part of the record and it wasn't. No, I understand. I'm just trying to get the gist of. Yeah. The important point is, though, Your Honor, yes, although it did go on, it did go on and there wasn't necessarily a dinner break or anything like that. I think, as Justice Smith pointed out, the confession happens in 70 minutes, which is pretty quick. I mean, in 70 minutes, she's like, okay, I lied. Okay. You know what? I didn't put her in the crib. In fact, she was crying. I couldn't get her to stop crying, and so you know what? I lied about that. I put her in the closet. I walked outside. I had a smoke break, and I came back, and she's not crying. Now, a reasonable person is going to know, you know, when you're being asked about the circumstances surrounding the death of your child, hey, you know what? You're going to have more questions, you know, and at that point, actually, she's crying, so what do they do? They don't press her. They don't push on her. They don't confront her more and say, you're guilty, you know, cough it up, lady. They take a break. That's when she goes outside. Yeah, they never tell her you have a right to a lawyer. That's what she said. They didn't have to. They absolutely didn't have to. I understand. That's what the case is all about. But didn't they say at that point, didn't they say, you know, we're parents. Right. You know, we don't put, you know, parents don't put their kid in a closet and close the door. Right. That's a good question, Your Honor. That's simply good questioning to say, you know what? It's also good, but you didn't want her to confess. They knew, and they wanted her to confess. That's interrogation. It is. It's an interview, and they were there to find, because it doesn't make sense. When something doesn't make sense to you as a law enforcement officer, yeah, you say, you know what? That doesn't make sense to me. I have a kid, and I have a parent, and, you know, when I put. Tell us the truth. And what is so wrong with that? Asking someone to, you know. How about, you know, the charge is really significant. The warnings that should be given are it's irrelevant what the charges are, whether it's jaywalking. What's wrong with just saying, you know, we've got some serious questions for you. And I think that was said. And the answers are going to be, you know, might be incriminating, you know, a little Miranda. I. Yes, Your Honor. I don't mean to make light of it. No, no, I don't. It's really, it's dead serious. It is dead serious, Your Honor. It is. And it's a terrible event. It is. The whole thing is. And I'm sorry. I didn't mean to make light of it. No, no, no. And I'm sure you didn't, Your Honor, and I don't either in the way I'm describing the case. But this is vastly different. I'm serious. This is vastly different, for example, from the Kim case where the Ninth Circuit was so upset. Mrs. Kim wanders down to her store. She's terrified. She's calling out for her son. Her husband's right behind her. And this goes to Mr. Corn's isolation point. And when she gets to her store, what do they do? They say, come in. And then the husband tries to follow her in, and they go, no, you stay out. And they lock the door. And they shut the door. And she doesn't speak English. And she's going, what's going on? And they go, sit down. Shut up. They literally said, that's in the opinion. They told her to shut up. Those are the kind of things where the Ninth Circuit, and rightfully so. Are you trying to say that they have to be rude in order for her to be in custody? No, I'm saying if a law enforcement officer is rude, then that is definitely a factor which weighs in favor of a finding of custody. If they are excruciatingly polite, a reasonable person is more likely to believe, you know what, what these guys told me at the beginning of the night, that I'm free to go at any time, it's the truth. That they mean it. And I'm feeling more in control because I'm not getting yelled at. I'm not being told to shut up. I'm not being told to sit down. I'm not being kept from my husband. When they act in a certain way, when their behavior reinforces what the words that have come out of their mouth, what they have just told you, then a reasonable person does feel free to leave, does feel more in control of the situation. And Miranda is absolutely not necessary. It becomes less coercive. It's also voluntary. Help me out. Was there some suggestion here that she could come back the next day or something like that? I don't recall that off the top of my head. I don't. I don't either. I'm not sure. Okay. That was part of the. . . Yeah, the district court, one element I really haven't discussed much is, even in the district court's ruling, although he denied the motion to suppress, he did express concern about the overall time that she was there. Yeah. He said that was the most difficult issue for him. Yes, Your Honor, and what was interesting is, and I wasn't sure if the lower court was trying to make this distinction or suggest that we go into it, but the case law talks about duration of the detention, and yet the district court specifically talks about duration of the interview, suggesting that, in fact, he was trying to stay far away from the idea that she was detained in any manner. And certainly, yeah, it would be nice if all cases were like the Norris case, where they could go, can we talk to you? And he sits down and he goes, okay, this is what I did, and he just confesses. That doesn't happen in real life. In real life, sometimes it takes 70 minutes for a murderer to say, okay, okay, okay, I lied, I lied, okay. But still, and yet that's a short period of time, especially given when warnings are given that when someone is told, hey, you can stop this interview in time, you can go, we'll drive you home, it's not a problem. I don't know if I have. . . You still have two minutes. I have one other question I wanted to ask you. Please, please. So after she makes the confession and they take whatever, they take her back to her house and she signs a waiver to search her house. Correct. Let's just hypothetically speak, if the panel were to disagree with you on custody. Right. What's the situation at the house? Well, at the house, Your Honor, she was not in custody. I mean, it's a totally different analysis, and I disagree that it's fruit of the poisonous tree. There's absolutely no taint. She's back at home. She's with her husband. She is rewarned and told specifically in writing of her ability to refuse consent. And despite that, she decides to allow for them to search her home. That's a permissive search. So I disagree that it's fruit of the poisonous tree. I believe that there is no taint anymore. They still didn't give her Miranda warnings at the house. Is that right? They still did not give her Miranda warnings at the house. They did not. How come they didn't give her Miranda warnings at the house? Because she was not in custody, Your Honor, and you don't have to. What if she were in custody? If you're in custody, you better give Miranda. You better give the appropriate warnings. But she was never, ever in custody. Okay. If there are no further questions, then I will stop. There are, in fact, five factors, again, right, to determine whether the consent to search was given, the first being whether she was in custody, the third being whether the Miranda warnings were given. The other three are whether the arresting officers had drawn their guns, whether the defendant was notified she had a right to deny consent, and whether she was told a bench warrant could be obtained. A search warrant, Your Honor, yes. Or a search, sorry. Yes. And the district court, in fact, found on that, I believe what you mentioned, that's the third issue, that reiterated that Miranda was not necessary because she was simply not in custody. Thank you, Your Honor. Thank you. Your Honor, if I could be just briefly heard. Your Honor, this whole issue of detention is, I think, telling because if you recall in the circumstances of the case, when she wanted to go to the restroom, she didn't just get up, walk over there, and go to the restroom. She had to ask permission. The agent, Agent Picard, on cross-examination was asked whether or not they told her she would be taken home, and he said yes. The only thing that he told her was that after the interview we'll take you home. So it is clear, Your Honor, that there was detention. Finally, with respect to the issue of being polite, we would submit that's a code word for trying to suggest what she should say. In other words, I'm a good guy. Isn't this what really happened? She went over her statement over two times and finally videotaped it. So we would submit that, Your Honor, the totality of the circumstances is clear that it was custody. Thank you. Thank you. The case just argued is submitted for decision. We'll hear the next case for argument, which is Nguyen v. Lucchesi.
judges: Schroeder, Paez, Smith